OF

## THE STATE OF NEW JERSEY.

### 1920-1921.

EDWIN ROBERT WALKER, ORDINARY.

EUGENE STEVENSON, EDMUND B. LEAMING, VIVIAN M. LEWIS,
JOHN H. BACKES, JOHN GRIFFIN, JOHN E. FOSTER,
MALCOLM G. BUCHANAN AND JAMES F.
FIELDER, VICE-ORDINARIES.

GAIL H. HELMER, as executor of the last will and testament of
George J. Helmer, deceased, petitioner,

*v.*

FARNHAM YARDLEY and HENRY MONTAGUE, as executors under
the last will and testament of Alfred B. Jenkins, deceased,
respondents.

[Submitted September 1st, 1920. Decided January 28th, 1921.]

1. Where a testator gave his friend, a well-known osteopathic doctor,
$25,000 if he should succeed in establishing "his" clinic for the advice
and treatment of patients under the School of Osteopathy, the condition

397

precedent to the vesting of the legacy was not satisfied by the establishment of the New York Osteopathic Clinic by the physician, with a number of other doctors, who procured the incorporation of a company to conduct the clinic in which, by common consent, no doctor would be in control of its business.

2. The orphans court possesses jurisdiction over suits for the recovery of legacies and distributive shares, and therefore has authority to construe a will in a suit against executors to compel payment of a legacy even though the construction of the will is the primary question to be determined in order to make a decree.

On appeal from a decree of the orphans court of the county of Essex, made by Judge Martin, who filed the following opinion:

"Alfred B. Jenkins, late of West Orange, died the 29th of December, 1916, leaving a last will and testament, which was admitted to probate the 10th of January, 1917. The will was executed on the 11th of June, 1915. The ninth paragraph provides as follows:

" 'NINTH. If I have not already provided for the same during my lifetime, and if my friend, Doctor George J. Helmer, now of Nyack, New York, shall succeed in establishing his clinic for advice and treatment of patients under the School of Osteopathy, I give and bequeath to him for his assistance in establishing such clinic the sum of twenty-five thousand dollars. If, however, I have made my contribution to him, or if by the time of the taking effect of this, my will, he has failed to establish the clinic. I direct that this legacy shall lapse, fall into and become a part of my residuary estate.'

"Dr. Helmer, a resident of Nyack, New York, survived the testator and died the 15th of March, 1917, leaving a last will and testament, which was admitted to probate by the surrogate's court, county of Rockland, New York, and letters testamentary were issued to petitioner, who qualified and is now acting as executrix.

"The pleadings admit that testator did not make his contribution to the clinic of Dr. Helmer nor provide during his lifetime. for establishing any clinic for the treatment of patients under the School of Osteopathy.

"The issue is whether Dr. Helmer performed the condition precedent prior to the time of the death of testator, December 29th, 1916.

"The parties agreed at the hearing that this provision was not intended as compensation or reward personally to Dr. Helmer for his services rendered. This agreement seems to be proper. Clearly, the intention of testator was to give $25,000 to aid the free advice and treatment of patients under the School of Osteopathy. He placed the fund to be paid out under the direction of Dr. Helmer for the benefit of his clinic.

"The facts are not disputed. Dr. Helmer was one of the oldest graduates of the recognized School of Osteopathy and enjoyed a very large and lucrative practice in New York City, and was the leading osteopath in the eastern section of the country. He was the professional adviser of and administered osteopathic treatments to testator and members of his family during the five years prior to testator's death. The testator was a close personal friend of Dr. Helmer, and no doubt testator greatly admired Dr. Helmer personally and professionally, and believed in the school of treatment of human ailments espoused by Dr. Helmer.

"One of the witnesses stated that many years ago, probably about 1907 or 1908, Dr. Helmer spoke of the desirability of personally establishing a clinic for the osteopathic treatment of persons unable to pay, but the idea was abandoned by Dr. Helmer long before he ever knew the testator.

"The followers and adherents of the new School of Osteopathy as a scientific method of treatment of disease generally believed in the plan of benefiting the public by making better known the principles of their school, and to that end to establish a place where patients might be given advice and treatment practically free of cost. The purpose of the osteopathic physicians was supported by the belief that it would greatly enhance the reputation and standing of the School of Osteopathy.

"The Osteopathic Society of New York City, of which Dr. Helmer was a member from the time of its organization until his death, was the principal society of practitioners of the school in and around New York City. Dr. Helmer appears to have advocated and in fact did frequently speak to members of the society of his conviction that a clinic should be established in New York City for the treatment of the poor.

"In the year 1912 a resolution of the society was passed declaring that the time had arrived when efficient measures should be taken to establish a clinic. The committee was appointed and met from time to time for a period of two years and discussed various measures with a view of establishing a clinic. The natural result was the securing of the active support of the leading osteopathic physician and his friends. It was arranged among the interested osteopaths that they personally should not become members of the board of directors of the New York Osteopathic Clinic. The policy was adopted to promote harmony.

"The first effective step towards organizing a clinic was the selection of a board of prominent citizens.

"In 1914 Dr. Helmer obtained the interest and active cooperation of Mr. William Strother Jones, of the New York stock exchange, and the Rev. Charles J. Eaton, pastor of Madison Avenue Baptist Church. These two friends of Dr. Helmer were the first laymen selected to support the project, and their active participation gave great encouragement to those interested in the enterprise. Other osteopaths also invited some of their patients and friends to join the board. Mr. Jones was selected as the president of the board, and has since taken a very effective part in all the affairs and progress of the clinic.

"On May 30th Dr. Helmer invited a large number of osteopathic physicians in and around New York City to visit him at his home at Nyack, New York, and there was discussion of the proposed activities of the clinic.

"On the 13th day of March, 1914, a charitable or membership corporation was organized under the laws of New York, known as the 'New York Osteopathic Clinic.' It was stated that the object was to establish a dispensary to conform to the law. That savored too much of medicine but the official title and actual work show it to be the kind of clinic mentioned by testator. Dr. Helmer and a number of osteopaths made contributions for the purpose of giving it a standing and character sufficiently satisfactory to warrant the legally constituted authorities of the State of New York to permit it to begin its proposed operations, and on the 15th of April, 1914, the state board

of charities granted a license to the organization.   On the 1st of May, 1914, a lease for the building at 33 East Thirty-second street was entered into; the clinic for patients was opened the 13th of July, 1914, and it has since continuously given advice and treatment to patients under the School of Osteopathy free of charge except where the patient could pay some money but much less than the usual charge of osteopaths.

"Dr. Helmer was a member of the clinical staff and gave his support, co-operation and time and attention to the activities of the institution and personally gave advice and treatment to patients at the clinic until his decline in health prevented him. After the summer of 1916 he sent a substitute to perform his personal work with the patients.

"The money raised for the initial work of the clinic at the time of the incorporation was rapidly disbursed and exhausted during the first year of the existence of the clinic.   The finance committee, of which Dr. Helmer was a member, relied to a great extent upon Dr. Helmer to relieve the situation, because his practice was recognized to be unusually large amongst the wealthier class of people, and therefore it was believed he could raise more money than the rest.   During April, May and June, 1915, about the time of the preparation and execution of the will of Alfred B. Jenkins, Dr. Helmer was particularly active in enlisting and obtaining financial assistance for the institution. At a meeting of the Osteopathic Society of New York City in May, 1915, he secured pledges of financial support and stimulated competition and the interest of his fellow-osteopathic physicians by marking up the pledges on a blackboard.   He personally pledged the sum of $1,000, which was an example for the others.  All of these efforts and activities on Dr. Helmer's part were for and on behalf of the newly-formed and struggling clinic.   As a result the temporary difficulties in which the New York Osteopathic Clinic was enmeshed were very greatly relieved and the institution has continued to exist and carry on its work up to the present time.

"This New York Osteopathic Clinic was the only one in which Dr. Helmer was, or for many years had been, interested.   There was no other clinic in or around New York City contemplated,

designed, in progress of formation or in existence. There is no evidence of the existence of any other clinic that could have been known to testator.

"Petitioner contends that she has shown by the uncontradicted evidence, and the fair inferences to be drawn therefrom, that the condition precedent to the validity of the legacy had been fully performed by the incorporation—actual establishment and continuation of the New York Osteopathic Clinic.

"The contention of respondent is, that the part performed by Dr. Helmer in the formation of the New York Osteopathic Clinic was merely as one of a number of other osteopathic physicians and their friends and that the enterprise was the product of the joint efforts of the members of the Osteopathic Society of New York City, and not the product of the personal efforts of Dr. Helmer. Hence, it is argued that Dr. Helmer, himself, may not be said to have succeeded and that the clinic should not be designated as 'his' clinic.

"Petitioner must show (1) that Dr. Helmer succeeded; (2) in 'establishing' a clinic; (3) that it was 'his' clinic; (4) that the clinic was for the advice and treatment of patients under the School of Osteopathy, and (5) that the establishment was prior to the death of testator.

"There is no controversy that the clinic established was under the School of Osteopathy nor that it was before his death. This eliminated (4) and (5) from the discussion.

"It will be helpful to endeavor to ascertain what the testator means by the word 'establishing.' The word 'establish,' in the standard dictionaries, is defined in part as follows:

" '1. To make stable, firm.

" '2. To put or fix on a firm basis: settle stably or fixedly; *put in an efficient state or condition.*

" '3. To confirm or strengthen; make more stable or determinate.

" '4. To confirm by affirmation or approval; sanction; uphold.

" '5. To make good; substantiate; show to be valid or *well grounded; cause to be recognized as valid* or legal; cause to be accepted as true *or as worthy of credence.*'

"In its primary sense the meaning is 'to settle or fix firmly.' *2 Words and Phrases (2d series) 323.* Other definitions are 'to put * * * in an efficient state or condition.'

"Hence, one who completes the original enterprise or plan of another or who places it in an efficient state or condition may be said to establish it.

"It is not necessary to discover the original idea or plan, actively and exclusively found and erect an institution based on the plan and place it in a position fully to perform all its functions in order to establish it.

"The absolute and positive fulfillment of the condition to the highest degree, character or extent that may be imposed is seriously modified by the testator because, after stating that if Dr. Helmer succeeds in establishing his clinic, then he gives $25,000 to him for his assistance in establishing such clinic. If it must be fully completed, then how could it be possible to use money to assist in completing it? This demonstrates the different meanings attached to the word 'establishing' adopted by testator, and indicates that Dr. Helmer need not be the sole designer, founder, constructor, supporter and director of the clinic.

"Dr. Helmer in fact was the leader in the early days of the struggle of the adherents of osteopathy for recognition of their school of treatment of disease. He talked of his own clinic, he readily and heartily joined others in the work, and in many respects led the efforts in organizing the New York Osteopathic Clinic; he made it stable and firm by his efforts before and during the time of its incorporation and efforts to secure a license. He helped to strengthen it, to make it good and caused it to be worthy of credence.

"The fruit of the efforts of Dr. Helmer is the clinic fully performing the purposes of those interested in it and actually advising and treating patients. Without the work of Dr. Helmer the clinic would not have been functioning at all or to the extent it was at testator's death.

"The result need not necessarily be the sole produce of personal effort. One who is effective usually organizes the effort of others. Most of our great captains of industry have established their business by this method.

"The testator by the ninth provision of the will meant some-thing effectual. As construed by respondents he did not refer to the New York Osteopathic Clinic. If not to that, then to what did he refer? The rational meaning of the will is that Mr. Jenkins knew that Dr. Helmer was devoting his time, thought and effort to some worthy cause that enlisted the sym-pathy of Mr. Jenkins, a business man of great experience and ability, and caused him to endorse it and to further the effort of his friend Dr. Helmer and gave it a large sum of money. If Dr. Helmer had no clinic in mind, or was not interested in any clinic, then Mr. Jenkins was dealing in meaningless words. Such construction is the inevitable result of the logic of the conten-tion of respondents, because they fail to prove the existence or contemplation of any other clinic.

"If Dr. Helmer, alone, in a small office, advised and treated patients free of charge by the method of the School of Osteo-pathy prior to the death of testator, the respondents would be compelled to admit that the condition precedent had been per-formed. No such single-man affair would accomplish any such general good as is fairly reasonable to believe the New York Osteopathic Clinic has done or is doing. Mr. Jenkins was, un-doubtedly, aware of that and intended to place his money in the most effective means of doing this great good for a large number of patients under the supervision and direction of his friend.

"The New York Osteopathic Clinic was known to testator as the clinic of Dr. Helmer, and testator naturally designated it as 'his' clinic.

"Respondents also contend that between the execution of the will and death of Mr. Jenkins, Dr. Helmer must succeed in establishing his clinic. No such requirement is inserted in the will, nor is it necessarily contemplated by the surrounding cir-cumstances. In fact, Dr. Helmer could have performed the con-dition precedent by succeeding in establishing his clinic at any time before the death. The ninth paragraph provides 'if by the time of taking of this my will he has failed to establish the clinic * * * the legacy shall lapse * * *.' The testator is conclusively presumed to know the law, and therefore he knew the will would take effect at his death.

"In seeking the intention of the testator, as shown by his will, and in giving every word of the ninth provision its fullest significance, and considering the surrounding circumstances and the purpose and effort of Dr. Helmer and the knowledge of them which the testator no doubt possessed, this clinic must have been known to the testator as the clinic which was the subject of Dr. Helmer's efforts; hence, he 'succeeded' in 'establishing' 'his clinic.' Dr. Helmer was the leader of the profession. There was general recognition made of the fact that his leadership was necessary to the success of the enterprise.

"The executors, the respondents herein, immediately after the death of Mr. Jenkins, wrote to Dr. Helmer as follows:

" 'We beg to inform you that under the will of Alfred B. Jenkins, of West Orange, New Jersey, a bequest was made to you as stated in the enclosed copy of Mr. Jenkins' will.'

"In response Mr. Helmer caused to be written to the executors a letter in part as follows:

" 'Being unable at this time to visit you in regard to the matter of the legacy referred to in article IX, of the last will and testament of the late Alfred B. Jenkins, I beg to advise that the Osteopathic Clinic in which I am interested, and which I was instrumental in organizing, is officially known as the New York Osteopathic Clinic, Inc., now located at 35 East Thirty-second street, of which William Strother Jones is president. He will be able to give you all other proof that you may want regarding the organization and conduct of the clinic.'

"This letter was admitted merely as evidence of the receipt of the previous letter from the executors but not as competent evidence in any way to establish the truth of the facts stated in the letter itself. It may be, that as a statement in the regular course of business by a person since deceased, a disinterested third party at the time, making a statement disclaiming any personal interest whatsoever, that the contents of the letter are evidence of those facts. The court, however, will not now change the ruling at the hearing.

"The contention of respondents is that if Mrs. Helmer personally receives the money ultimately under the will of Dr. Helmer, in which she is named the sole legatee, that she may use it as her own. The will of Mr. Jenkins must be construed in

relation to the facts existing at the time of his death. Then Dr. Helmer was alive. The will of Mr. Jenkins does not provide that if Dr. Helmer dies shortly after the death of Mr. Jenkins that the fund shall vest in some other person. It seems to be perfectly clear, however, that the New York Osteopathic Clinic will succeed in an action against petitioner seeking to establish a charitable use directly for its benefit, particularly in view of the straightforward admission contained in the letter written by Dr. Helmer on the 5th day of March, 1917, and signed on his behalf by the petitioner personally.

"Under all the circumstances it seems reasonable to conclude that the condition precedent was fulfilled. The intention of the testator was to give the fund to Dr. Helmer to be applied by him for the purpose of further establishing his clinic for the benefit of patients in the event that such progress had been made as was sufficient to show that a foundation had been laid and the continuation of the clinic was reasonably assured at the time of the death of the testator.

"Petitioner is therefore entitled to judgment, with costs."

*Messrs. Congleton, Stallman & Hoover*, for the petitioner.

*Messrs. Vredenburgh, Wall & Carey*, for the respondents.

GRIFFIN, VICE-ORDINARY.

The executrix of Dr. Helmer filed her petition in the orphans court of the county of Essex under the one hundred and ninety-second section of the Orphans Court act, which, after reciting the ninth paragraph of Mr. Jenkins' will (which is set forth in the opinion of Judge Martin), and alleging performance of the condition precedent, prayed that his executors be directed to pay the legacy to petitioner.

But one question was presented to the orphans court. viz.: Had Dr. Helmer, when the will of Mr. Jenkins took effect, performed the condition precedent to the vesting of the legacy? The court, finding that the establishing of the "New York Osteopathic Clinic" satisfied the condition, decreed that respondents pay to the petitioner the legacy.

From this decree the respondents appealed and raise the additional objection to the decree that the orphans court was without jurisdiction to entertain the suit.

Passing the question of jurisdiction for the present, and dealing with the case as presented in the orphans court, it appears that the sole question was, What did testator mean when he used the words "his clinic?"

If Dr. Helmer had established the New York Osteopathic Clinic, and was the owner thereof at the time of testator's death, it is quite clear the legacy would be payable.

This, however, was not the fact. What he did was to join with other doctors in procuring the incorporation of a company to conduct a clinic, in which, by common consent, no doctor would be in control of its business management.

To this end, the doctors, who were the leading spirits in the project, each selected a certain number of men in other pursuits to become incorporators and directors. There is nothing in the case which indicates that any one doctor possessed greater rights than another—in fact, the evidence is to the contrary—and there is nothing in the evidence to indicate that the directors were without power to dispense with the services of Dr. Helmer as well as of the other attendant doctors.

The pertinent facts are as follows: In the year 1900 there was an Osteopathic Society in New York City (hereinafter referred to as "the Society"). About 1912, this Society appointed a committee, of which Dr. Fleck was chairman, to form a corporation, which was accomplished March 15th, 1914. Dr. Helmer did not initiate the movement, but, being leader in his profession, Dr. Fleck sought his aid, which he actively gave. It was considered by the promoters unwise to have doctors as incorporators or directors lest it might cause jealousy and strife, which would be detrimental to the enterprise; because, as Mr. Jones, the president, said:

"No doctor likes to have another doctor be the whole thing; they might say this was Fleck's clinic, or this was Reilley's clinic, if they were prominent particularly in it, and to avoid that the board of directors have appointed the rules committee;"

and Dr. Fleck frankly states "there was not a 'Fleck's Clinic,' or 'Helmer's Clinic,' or 'Jones' Clinic;' we tried to avoid that."

Dr. Helmer and four others were appointed on the rules committee, which worked under the board of directors; and about eighty other doctors contributed their services. Dr. Fleck also states that after the incorporation he, as chairman of the committee of the society, made reports to it.

In order, to form this clinic it was necessary to obtain the permit of the state board of charities, and the doctors who were on this committee deemed it necessary to raise funds to satisfy the state board, and there was raised $4,800. Dr. Helmer, and the other four on the committee, each contributed $100 and promised to raise a thousand dollars apiece from their patients and friends. Dr. Helmer was one of the five. The approval of the state board of charities was endorsed on the certificate of incorporation. There were nine incorporators who became directors. No doctor was either an incorporator or a director, thus carrying out the original plan of the promoters.

The clinic began to function about April, 1914; rented quarters and employed help. Its income from the treatment of patients (some of whom only could pay), at seventy-five cents a treatment, brought in so little that in about May, 1915 (about the time the testator's will was made), it was in financial straits, and an effort was made to raise funds. It does not appear that the testator was either approached on the subject or that he contributed anything—in fact, it does not appear that he even knew of its existence.

Therefore, in order to sustain the decree, the words "his clinic" must be construed not in the possessory, but in the sense that one speaks of "his city," "his country," "his church," "his school," and the like. The question, therefore, arises, In what sense did the testator use the words "his clinic?"

Examining the entire will to ascertain his intent, and taking the situation and surroundings of the testator at the time the will was executed, it appears that in the eighth clause he gave to seven charitable institutions, by name, $75,000, two of the bequests being for $25,000 each, and five for $5,000 each, with the

provision that the money should be added to the endowment fund of the several institutions,

"the principal thereof to be retained intact and to be known as 'Alfred B. Jenkins Endowment' or 'Memorial,' as the case may be, the income only to be used for the benefit of the institutions respectively."

Then follows the names of the institutions with the amounts bequeathed to each. In the tenth, or residuary clause, in the event of his daughter dying without leaving lawful issue her surviving, either before or after his decease, he bequeathes the residue as follows: He gives to four of the legatees mentioned in the eighth clause additional legacies aggregating $60,000, and thereafter what remains he gives to twelve institutions of learning,

"the principal to be held as a part of the endowment fund known as the 'Alfred B. Jenkins Endowment' of said institutions respectively, the income only to be used by the institutions."

These clauses indicate the bent of the testator's mind, namely, that where he gave to corporate charity he provided that the principal of the fund should be held intact and the income only used for maintenance. No such provision was made in the ninth clause. The question, therefore, arises, if he intended that the legacy should go to such institution as Dr. Helmer might be connected with, why did he not make the same provision for the use of the income only as he made in other cases? What motive could there be to give to this charity $25,000 outright, and give to the others only the income?

In determining this question, regard must be had to the object of his bounty and the purpose sought to be accomplished.

Dr. Helmer was the leader in his profession. He was not only the family doctor of the testator, but they and their families were socially intimate. Dr. Helmer was a magnetic man, and died at the age of fifty years. Several years before this will was made, Dr. Helmer had under consideration the establishing of his own personal clinic, which idea he later abandoned. The case does not disclose whether the testator knew of the doctor's ambition, nor of the existence of the New York Osteopathic Clinic; but

the fact does appear that the clinic was in dire need of funds at about the time the will was made, and that Dr. Helmer, with others, sought to raise funds for it; and it does not appear that the testator was solicited, or made any contribution to it; yet it is quite likely that he would be a large contributor if he had been solicited, if it was his purpose to give $25,000 to a clinic answering the description of the New York Osteopathic Clinic.

It is quite probable that, in their professional or social relations, Dr. Helmer discussed with the testator his thought of establishing his own personal clinic; and, being desirous of aiding his friend and doctor, the testator made the bequest with the condition annexed, without any such provision that the income only should be used, as in cases where legacies were made payable to corporations. This latter theory is more or less speculative, but is merely referred to in view of the fact that the petitioner asks the court to ascribe a different meaning to the words "his clinic" than their grammatical import.

"It is a fundamental rule that courts both of law and equity will construe words according to their strict and primary acceptation, unless, from their immediate context, or from the intention of the parties apparent on the face of the instrument, the words appear to have been used in a different sense; or, unless, in their strict sense, they are incapable of being carried into effect." *Hollinshead* v. *Wood, 84 N. J. Eq. 492.*

In *Marshall's Executors* v. *Hadley, 50 N. J. Eq. 547, 551,* Vice-Chancellor Van Fleet said: "The whole will must be read and all its provisions must be carefully considered, and then such construction must be adopted as will give effect, if possible, to every word in it. If by the use of plain and unambiguous words he has made his meaning clear and certain, his will expounds itself, and all the court can do, or has power to do, is to give effect to his purpose. All doubts must be resolved in favor of the testator's having said exactly what he meant, and plain, clear words, understood in their ordinary sense, must always control, unless repugnant to other words used in another part of the will." See also *Burnet* v. *Burnet, 30 N. J. Eq. 595.*

An analysis of the ninth clause indicates that the gift was personal to Dr. Helmer, not only to aid him in his enterprise, but

to place the conduct of the clinic under his sole dominion and control. The terms of this gift differ not only from all the others in his will, but its language is significant in this—that the testator had in mind the possibility of contributing to Dr. Helmer in his lifetime, or the failure of Dr. Helmer to establish a clinic; therefore, he said:

"If, however, I have made my contribution to him, or if by the time of the taking effect of this my will he had failed to establish the clinic, I direct that this legacy shall lapse, fall into and become part of my residuary estate."

It may reasonably be assumed that, with the great faith the testator had in the integrity of Dr. Helmer, if he had made his contribution to him in his lifetime he would hardly have annexed conditions to its use which might display a lack of confidence in the doctor. Nor was it his purpose, if he had not made his contribution, and the doctor had performed the condition precedent, that he would provide in his will safeguards as to its use. Therefore, in this particular bequest, the testator simply gave to Dr. Helmer the legacy upon one condition only—that he should establish his clinic—without annexing conditions of divestiture, after vesting; relying solely upon the honor of his friend to use it for the maintenance or otherwise of the clinic after it had been established.

Considering that a clinic, according to osteopathists, is a charity, and that Dr. Helmer would be compelled to give his time and money to its establishment, I am not prepared to say that, after the legacy vested, he could not use the legacy for his reimbursement, discontinue the clinic (because there is no limitation as to its continuance), or, in the event of his death, his executrix could not discontinue it (because the personality of Dr. Helmer could no longer dominate it) and hold the legacy as assets of the doctor's estate. All this is unnecessary to decide; but it shows how unwise it is to depart from the plain meaning of words when the field opened by so doing is uncertain and may lead to the court making the will of the testator.

My conclusion is that the establishment of the New York Osteopathic Clinic did not satisfy the condition precedent to the vesting of the legacy.

The second point raised by the appellant questions the jurisdiction of the orphans court to entertain the suit.

In *Deeks* v. *Strutt, 5 T. R. 690*, it was held that an action to recover a legacy could not be maintained in the courts of law.

In 1774 an act was passed giving jurisdiction to courts of law to entertain suits for legacies.

But that suits for legacies might be maintained in the courts of law, by statute, does not alter their essential character; they do not change their nature to suit the law of the court, but the court changes its law and accommodates itself to its peculiar character. When suits for legacies were first prosecuted in courts of chancery they were obliged to adopt the law of the spiritual forums, and so it has been with the courts of common law. *King* v. *Executors of Berry, 3 N. J. Eq. 44 (53)*; citing *Ridg. P. C. 243*. And a provision to the like effect was inserted in the Orphans Court act.

In *Hedges* v. *Norris, 32 N. J. Eq. 192*, Chancellor Runyon, in an elaborate opinion, gives the history of the law in suits for legacies, citing *Deeks* v. *Strutt, supra*.

In 1855, after our constitution went into effect (*P. L. 1855 p. 342*), jurisdiction was given to the orphans court over suits for the recovery of legacies and distributive shares. This act, as amended, will be found in *3 Comp. Stat. p. 3883 § 192;* and, as amended, contains the following: "* * * and the proceedings in such suits thereafter shall in all respects be governed by the rules and practice of the court of chancery so far as the same are applicable." Therefore, it will be perceived that, both at law and in the orphans court, the suit for a legacy was regarded as equitable in its character.

Thus, at the outset, two constitutional questions are presented —*first*, whether the legislature had authority to give jurisdiction to the orphans court to entertain suits for legacies, and *second*, if, possessing such jurisdiction, it has authority to construe a will where the construction of the will is the primary question to be determined in order to make a decree.

In *Davison* v. *Rake, 45 N. J. Eq. 767*, it appeared that eight legatees instituted suit in the orphans court for the recovery of their legacies. From the decree of the orphans court an appeal

was taken to the prerogative court. From the decree of the vice-ordinary, whose opinion is reported in *Davison* v. *Rake, 44 N. J. Eq. 506*, an appeal was taken to the court of errors and appeals. In neither the prerogative court nor the court of last resort was any question raised as to the jurisdiction of the orphans court to entertain a suit for a legacy, and both courts dealt with the subject-matter of the appeal and pronounced their decisions. See also *Wyckoff* v. *O'Niel, 71 N. J. Eq. 681*.

In view of these decisions, I will assume that the orphans court has jurisdiction to entertain a suit for a legacy.

The reason for dealing with this point is for the purpose of considering cases which have arisen under the distribution acts in cases of testacy and intestacy. The distinction between such suits and a suit for a legacy is apparent. The decree for distribution in the orphans court is a mere continuation of a proceeding commenced before the surrogate and concluded in the orphans court; whereas, a suit for a legacy or distributive share is an original suit, independent of such proceedings. Yet, if that court has jurisdiction over suits for legacies or distributive shares, the right to construe the will in such cases may be determined by analogy to the numerous cases which have arisen under the statutes of distribution.

In *Hill* v. *Bloom, 41 N. J. Eq. 276, 280*, it was objected that the orphans court had no jurisdiction to make a decree of distribution, because, in order to do so, it was necessary to construe the will, and that the court had no such authority, Chancellor Runyon, sitting as ordinary, on an appeal from the Sussex orphans court, said (at *p. 280*) : "The power to construe the will, so far as necessary to determine to whom the distribution or payment is to be made, is obviously a necessary incident of the power given by that section." *Orphans Court act, § 151, Rev. of 1877 p. 785; 3 Comp. Stat. p. 3877 § 173.*

In *Adams* v. *Adams, 46 N. J. Eq. 298 (302)*, where the distribution of property under a will was considered, counsel for the respondent contended that the orphans court had no jurisdiction to construe the will, and any grant of such power would be unconstitutional as taking from the court of chancery a part of its jurisdiction. Mr. Justice Magie, speaking for the court of

errors and appeals, referring to *Hill* v. *Bloom, supra,* said: "It has not been thought necessary to determine the point thus presented, which was not argued on the part of the appellants," and decided the case on other grounds.

In *Macy* v. *Mercantile Trust Co., 68 N. J. Eq. 235,* Vice-Chancellor Emery said (at *p. 243*) : "The power of the orphans court to construe wills for the purpose of distribution was affirmed by Chancellor Runyon in *Hill* v. *Bloom (1886), 41 N. J. Eq. 276,* but no question as to the constitutionality of the statute appeared to have been raised, and subsequent decisions hold this question to be still an open one. *Adams* v. *Adams, supra; Stevens* v. *Dewey, 55 N. J. Eq. 232.*"

See also *Polley's Case, 70 N. J. Eq. 659; Eberhardt* v. *Perolin, 48 N. J. Eq. 592; 49 N. J. Eq. 570; Swain* v. *Smith, 61 N. J. Eq. 590; In re McGaw's Case, 88 N. J. Eq. 288.* And the last deliverance on the subject is by Chancellor Walker, sitting as ordinary in *In re Morrisse's Estate, 91 N. J. Eq. 477; 110 Atl. Rep. 118,* in all of which cases the court did not pass on the constitutionality of the statute because it was either unnecessary to the decision of the cause or the will did not need construction.

The foregoing cases clearly indicate the doubts entertained by the judges of the court of errors and appeals and the court of chancery on this question of jurisdiction. But, as the court of errors and appeals, in the case of *Davison* v. *Rake, supra,* dealt with a suit for a legacy in the orphans court and did not declare that the statute conferred no power on the orphans court to entertain jurisdiction, and, as Chancellor Runyon, in *Hill* v. *Bloom, supra,* where the point was made that the orphans court was without authority to construe the will, decided against this contention, as above stated, I think the weight of authority at the present time is in favor of the jurisdiction.

A decree will be advised reversing the decree of the orphans court.